IN THE

## SUPREME COURT OF THE STATE OF GEORGIA,

## AT SAVANNAH,

## JANUARY TERM, 1851.

Present—JOSEPH H. LUMPKIN, ⎫
        HIRAM WARNER, ⎬Judges.
        EUGENIUS A. NISBET, ⎭

~~~~~~~~~~~~~~~~

No. 45.—R. McLEOD *et al.* trustees, &c. plaintiffs in error, *vs.* HENRY K. BURROUGHS, defendant.

[1.] A legislative exposition of a doubtful law, is the exercise of a judicial power, and if it interferes with no vested rights—impairs the obligation of no contract, and is not in conflict with the primary principles of our social compact, it is in itself harmless, and may be admitted to retroactive efficiency; but if rights have grown up under a law of somewhat ambiguous meaning, then it cannot interfere with them. The construction of the old law belongs to the Courts.

[2.] The Legislature, in a charter, declares " that it shall not be lawful for any person or persons, at any time or times, to build any bridge, or keep any ferry, on the river Great Ogeechee, within five miles, either above or below another bridge on the same stream:" *Held,* that the distance of five miles is to be measured on the course of the river.

[3.] Grants of exclusive privileges to corporations or individuals, are to be strictly construed; and if the terms of the contract between the individual, or the corporation, and the State, are ambiguous, the ambiguity must operate in favor of the public.

Injunction, in Chatham Superior Court. Decision by Judge H. R. JACKSON, February 20, 1850.

McLeod and others *vs.* Burroughs.

This was a bill filed by R. H. McLeod and others, as trustees, &c. to restrain the defendants from keeping a ferry on the Great Ogeechee River, at a place called Fort Argyle. Upon the coming in of the answer, a motion was made to dissolve the injunction. The following facts will be sufficient for understanding the points decided by the Supreme Court:

In 1806, the Legislature granted to Joseph Hill and his assignees, the right to erect a bridge over the Great Ogeechee River. By the 5th section it was provided, that " it shall not be lawful for any person or persons, at any time or times, to build any bridge, or to keep any ferry on the river Great Ogeechee, within: five miles either above or below the said bridge, which is hereby exclusively vested in the said Joseph Hill, his heirs and as-,signs."

In 1835, the Legislature authorized Benjamin Waulden to es-tablish a ferry at Fort Argyle, provided it did not interfere with the vested rights of others. This ferry was, in a right or air line, within five miles from Hill's Bridge; but, measured by the meandering of the river, it was *not* within five miles.

Plaintiffs in error and complainants below contended, that the measurement should be by a right line. Defendant contended, that the measurement should be by the meandering of the stream, and that the uninterrupted use of the ferry for fifteen years gave a right by prescription, and that complainants' rights, if any, were barred by lapse of time.

The Judge below dissolved the injunction, sustaining the defendants on both the grounds taken.

This decision is assigned as erroneous.

FLEMING and LAW, for plaintiffs in error.

MARSH and BARTOW, for defendant.

*By the Court.*—NISBET, J. delivering the opinion.

The construction which we feel constrained to give to the charter under which the complainants claim, to wit: the Act of 1806, as to the mode of measuring the distance, will control this

cause. According to that mode of measurement, the defendant's ferry and proposed bridge at Fort Argyle, are not within the prohibited limits: this is conceded. Being conceded, the complainants can, on no account, be entitled to the injunction. We are consequently relieved from the necessity of considering those other interesting questions brought to our notice in the assignment, and discussed with such affluence of learning, and labor of research on both sides. The fifth section of the Act of 1806 provides, " that it shall not be lawful for any person or persons, at any time or times, to build any bridge, or keep any ferry on the river Great Ogeechee, within five miles, either above or below the said bridge, which is hereby exclusively vested in the said Joseph Hill, his heirs and assigns." The complainants, who claim under Joseph Hill, aver in their bill that the defendants keep a ferry, and propose to erect a bridge on the Great Ogeechee, at Fort Argyle, within five miles of their bridge, erected under the grant to Hill, and ask an injunction. The controversy is this: shall the distance of five miles be measured in a right line from the bridge of the complainants to the ferry of the defendants, at Fort Argyle, or shall the line of measurement pursue the meanderings of the river?

[1.] In 1841, and long after the erection of the complainant's bridge under the Act of 1806, the Legislature passed a law in which it is declared, generally, that where exclusive privileges have been granted within prescribed distances on rivers, such distances shall be measured on the stream; and this Act is invoked by the defendants, as authoritatively settling the mode of measurement in this case. The Act of 1841 is a declaratory Act. The charter to Hill was accepted, and his bridge built under its protection before the Act of 1841. The rights of the complainants, whatever they may be under that charter, had vested before the Legislature had declared its meaning; that is, before they had enacted what should be the mode of measurement of distance in all such cases. It was insisted in the argument, that before a judicial construction has been given to a law, the Legislature may declare its meaning. This may be true, as applicable to a general law, where no individual rights have al-

ready vested under it. It is not retroactive, because no one is affected by it. It becomes a new rule, and, like any other law, is obligatory upon the Courts and the people. It is not my purpose to say, that in no case can the Legislature rightfully pass a retroactive law; nor do I find it necessary to advert to the distinctions which obtain upon this subject, further than to refer to the rule as settled by this Court in *Wilder vs. Lumpkin.* In that case we hold, that " a legislative exposition of a doubtful law is · the exercise of a judicial power, and if it interferes with no vested rights, impairs the obligation of no contract, and is not in conflict with the primary principles of our social compact, it is in itself harmless, and may be admitted to retroactive efficiency; but if rights have grown up under even a law of somewhat ambiguous meaning, then the universal rule of our system—indeed of the English system of government, and of other systems which approximate to free government—applies. That rule is, the Courts declare what the *law is*, the Legislature declares what the law *shall be.*" 4 *Geo. R.* 212. The Act of 1806 is a contract between the grantee, Hill, and the Legislature; both parties are bound by its stipulations ; what its meaning is, is for the Courts to determine. The grantee proceeds to invest under it according to his understanding of its provisions. He does so at the peril of a different construction by the Courts ; they can only act where a case is made. But he is not subject to the peril of legislative constructions ; if he were, then charters and grants would be but a mockery. Who would accept a charter if it was subject at all times to legislative construction ; that is to say, subject to be impaired by law? No sane man, or half-witted set of men. The power to sit in judgment upon his own contracts by one of the parties, is no where conceded under any system of free government; that would be an enormity at which justice revolts. The Legislature cannot impair the obligation of its own contracts. In our construction, therefore, of the Act of 1806, we lay out of view altogether the declaratory Act of 1841.

[2.] The argument, which it is admitted outside of the court-house, is very strong in favor of the construction of the 5th section of the Act of 1806, claimed by the plaintiffs in error, is

McLeod and others *vs.* Burroughs.

drawn from the topography of the river and its banks between
Hill's Bridge and Fort Argyle. It was stated in the argument,
that the Great Ogeechee River, in passing from Fort Argyle to
Hill's Bridge, instead of running in a direct course, makes a
considerable curve, and that the distance between these two
points, in a direct line, is less than five miles, whilst the distance,
if measured on the stream, is about ten miles. It was farther
stated, that for several miles above Hill's Bridge—perhaps as much
as five miles—the river is impracticable for bridge or ferry, in
consequence of impassable swamps on its southern bank. From
these facts, it is argued that Hill required no protection from
competition within five miles measured on the stream; nature
protected him within that distance, and therefore he asked for
none. The argument goes farther, and assumes that the topo-
graphy of the country being known to the Legislature, it is pre-
sumed that they acted in reference to it, and therefore when they
gave Hill an exclusive right within five miles, they meant to
say within five miles measured in a right line. Now, all these
things may be true, and, if true, make a strong equitable case for
the complainant. But can we assume that the *Legislature* acted,
in the grant to Hill, with reference to the peculiar condition of
this stream? with reference to its meanderings or its marshes?
Whilst the fact may be as stated, that the course of this stream
is not direct, and that its southern bank is lined with an impas-
sable morass, yet it is not apparent to us, and cannot be made so,
that these things were present to the mind of the Legislature,
and that they passed the Act of 1806 with reference to them.
It is true that Courts, in construing a Statute, will sometimes, in
order to ascertain the mischief which it proposes to remedy, con-
sider the circumstances which gave rise to it. Perhaps it was
competent in this case for the Court below, in its construction of
this Act, to have received evidence to inform its mind as to
these facts, and thus derive aid in arriving at the intention of the
Legislature. There is no evidence on the record that it did, and
no such evidence, as to the topography, comes to us for our aid, if
indeed the consideration of it, which I do not assert, would be,
in this case, legitimate. In interpreting the Act, we therefore ex-

VOL IX 28

clude the peculiarities of this stream, which I have stated to have been recognized in the argument. If the protection sought by Mr. Hill had reference to them, he is unfortunate in this, that the Legislature has failed to speak in such a way as to enable us to determine his rights in accordance with what he desired and expected. If it had not such reference, then Mr. Hill was unfortunate in not asking the prohibition for a greater distance. Whilst upon this subject, it is obvious to remark, that if the Legislature, acting with reference to the topography of the place, had intended the measurement of the distance to be in a right line, they would have expressed themselves to that effect in the Act. They have not so expressed themselves, and hence is derived an argument against the conclusion that they intended this mode of measurement. We are left, then, to construe this Act according to the well established and usual rules of interpretation.

In doing so, the object with the Court is to ascertain the intention of the Legislature. The inquiry is, what did the Legislature mean when it declared that it shall not be lawful for any person or persons, at any time or times, to build any bridge or keep any ferry on the River Great Ogeechee, either above or below the bridge of the complainant? The meaning of the Legislature is to be ascertained from the words of the particular clause under consideration, taken together with the whole Act. If, from these, the meaning is clear, no other rule of construction need be resorted to, unless the meaning be also absurd; for no construction can be given to a Statute against its plain and obvious meaning. If the Court can do that, it has the power of legislation. But if the meaning be doubtful, if the Statute is ambiguous, then resort may be had to the subject matter. In remedial Statutes, the old law, the mischief and the remedy are to be considered. This is not a remedial Statute. I cannot perceive that other parts of this Act shed any light upon this section. We resort then to the words used by the Legislature in this section, and to the subject matter of the Act. To the subject matter, because the words do admit of more than one construction, although we think the one we have adopted is fairly drawn from them, and is most reasonable. The words of

a Statute are to be taken in their ordinary and familiar signifi-
cation and import. If the Legislature had said it shall not be
lawful to build any bridge or keep any ferry *within five miles
of Hill's Bridge*, and no more, it would have been clear that the
distance was intended to be measured in a right line, and that
any bridge or any ferry upon any stream or ravine within five
miles, so measured, would be prohibited. But it has not said this,
and no more. Or if it had said it shall not be lawful to build
any bridge or keep any ferry *on the Great Ogeechee River*, within
five miles of Hill's Bridge, such a meaning would be perhaps the
fairest. But, although they have said this, they have also said
more; they have said that it shall not be lawful to build any
bridge or keep any ferry *on the Great Ogeechee River*, within five
miles, either above or below Hill's Bridge. Now, the object of
this language is to give to the grantee protection against compe-
tion within five miles. The competition guarded against is from
any bridge or ferry *on the river*, to be kept or built within five
miles *above or below* Hill's Bridge. *Collectively*, the several
phrases in this clause—in the apprehension of a plain man, and
taken in their ordinary and familiar signification and import—
would convey the idea that the Legislature, where it speaks of
distance in the use of the words, *within five miles*, meant dis-
tance on the stream above or below Hill's Bridge. The words,
*within five miles*, the common mind would understand to be
qualified by the words, *on the Great Ogeechee River* and *above or
below*. The subject matter of this clause is in aid of such an
understanding. What is that? It is a monopoly to Hill of the
bridge and toll privilege on the Great Ogeechee River. That
monopoly it was the purpose of the Legislature to grant, and
when it undertakes to define the limits within which it shall be
bounded, it must be considered as using words in reference to
the subject matter—that is, in reference to this bridge and toll
privilege, not generally, but on this particular river. The in-
ference is, that these words of distance refer to the stream. Hav-
ing first spoken of a bridge or ferry *on the river*; the natural
meaning of *above and below*, would seem to be above and below
in the course of that river; otherwise, the meaning of those

words is indefinite. If *above and below* be not on the line of the river, where is *above*, and where *below?* The ordinary meaning of these words, used in such connection, is not that of *location* —it cannot be here, because, in other words, in this section the location of the prohibited bridge and ferry is fixed—but that of course or direction. To my mind, they afford a satisfactory clue to the meaning of the Legislature. The construction which the plaintiffs contend for involves them in a very serious dilemma. They argue that any bridge at any point on the stream, within five miles of Hill's Bridge, measured in a right line, is prohibited. By this reasoning, a bridge at Fort Argyle is prohibited; but a bridge within the curve of the stream below Fort Argyle, and not within five miles of Hill's Bridge, is not prohibited. Suppose this last named bridge were built, what good would protection at Fort Argyle do them? This proves that their own construction is not equal to the necessities of their case. The only construction which would afford them entire protection would be, that any bridge or ferry on the stream, on a line drawn perpendicular to its general course, and which line runs within five miles above or below Hill's Bridge, is prohibited. But the law will not admit this construction, and the plaintiffs must be content with such as it does admit. Suppose that, in truth, the Ogeechee River, instead of curving, ran with only slight deviations from a direct course, and there were no impassable swamps on its bank, would there then be any doubt about the construction of this Act? I think not. This proves that the doubt now does not so much grow out of the Act itself, as out of the topography of the place. I do not consider that the subject matter of the Act aids the plaintiff's view of the 5th section. The subject matter of the whole Act may be stated to be the bridge and toll privilege to Hill, and the public benefit which would result from the erection of a convenient bridge by him. The object of the Legislature, in granting the exclusive privilege to Hill, within five miles, was clearly, by prohibiting other bridges and ferries within that distance, to constrain the travel approaching the river on both sides to cross at his bridge. Our construction, it is true, reduces the privilege of the plaintiffs below what it is

by their construction.   But what then ?   We do not annul the
Act—we give effect to it.   We do not thwart the intent and ob-
ject of the Act.   The travel is still restrained from crossing this
river at any point within the prohibited distance.   We declare,
as we understand it, the mind of the Legislature as to the extent
that they intended to place constraint upon the travelling public,
for the benefit of Mr. Hill.   He has his bond.   If he failed to
ask, or asking, the Legislature failed to give him sufficient pro-
tection, I repeat, it is his fault or his misfortune.   In consider-
ing the words of this Act, *usage* is to be regarded, for the *jus et
norma loquendi* is governed by usage.   *Smith's Commentaries,*
§513.   4 *Reps.* 47.   According to usage, when we speak of dis-
tance from one place to another, we are understood to mean
distance measured on the usual line of travel, that is, on the line
of the road between the places.   If we speak of distance from
the earth to a fixed star, (to use the illustration of his honor be-
low,) we are understood to mean distance measured in a right
line, because that understanding is according to the use of such
words among astronomers.   So, when we speak of a bridge on
a stream within five miles either above or below another bridge,
I think we would be understood, according to the common use
of such phraseology, to mean within five miles on the stream.

[3.]  There is one other rule of construction applicable to this
case.   It is this : grants of exclusive privileges to a corporation,
or an individual, are to be strictly construed.   The grantee takes
nothing by implication, and the rule has been settled to extend
thus far, to wit : that any ambiguity in the terms of a contract
between an individual or corporation and the public, in which
exclusive privileges are granted, must operate in favor of the
public and against the individual or the corporation.   This
rule has been settled in this Court.   1 *Kelly,* 533.   3 *Kelly,* 41.
Settled in England to the full extent that I have stated it.   In
the case of the *Proprietors of the Stone Bridge Canal Company vs.
Wheely et al.* the Court say, " the canal having been made un-
der an Act of Parliament, the rights of the plaintiffs are entirely
derived from that Act.   This, like many other cases, is a bargain
between a company of adventurers and the public, the terms of

which are expressed in the Statute, and the rule of construction, in all such cases, is fully established to be this: that any ambiguity, in the terms of the contract, must operate against the adventurers and in favor of the public, and the plaintiffs can claim nothing that is not clearly given them in the Act." 2 *Barn. & Adol.* 793. 11 *Peters*, 544 '5 '6. 6 *Ibid*, 728. 3 *Ibid*, 289. 4 *Ibid*, 168 *and* 514. 2 *Cow.* 420. 2 *Mass.* 146. *Eng. C. L. R. vol.* 40, *pp.* 298 *to* 319. 42 *Ibid*, 496. 2 *Scott N. R.* 228, *per Coleman, J. Ibid*, 226. 11 *East.* 685. *S. C.* 3 *Scott N. R.* 803, *per Maul, J.* 6 *Ibid*, 831. 1 *My. & K.* 165. 4 *M. & W.* 482. *Smith's Com.* §504.

The grant to Hill of the privilege of building a bridge over the Ogeechee River, with a right to charge toll, is not, I admit, a monopoly, because, to erect a bridge and charge toll is not a common right which belongs to all the citizens of the State. It is a right which can only be enjoyed under a grant from the Legislature. But when this right is granted, and with it is coupled an exclusive privilege within a prescribed distance, it becomes in the nature of a monopoly. For so long as it is exercised in accordance with the charter, the Legislature cannot revoke it; and the right of the citizen, common to all to ask for and receive such a grant from the Legislature, is precluded. Not only so, but the prohibition against other bridges within the prescribed distance operates as a restraint upon the right of the citizen, which is common to all, to pass the stream, in pursuit of business or pleasure, at any point most convenient to him. The exclusive privilege is in derogation of this common right, and the Act which confers it must be strictly construed. It may be admitted that, in the case before us, the derogation from this common right would be but to a very limited extent. Admitting the construction of the plaintiffs, the inconvenience which would result to the public would be small; perhaps, too, it would be fully compensated by the advantages of the complainant's bridge. Still, the principle upon which the strict construction rule is founded applies. To see the operation of the plaintiffs construction, suppose that the Tennessee River, which, rising in Virginia, runs southwestwardly across the State of Tennessee, and,

after making a prodigious curve, turns its course northward, and again crosses that State, was altogether within the jurisdiction of Tennessee, and the Legislature of that State should grant to a citizen the right to erect a bridge over it at the commencement of the curve on the east, with a prohibition, precisely as in this case, against bridges or ferries within a prescribed distance above or below it; and suppose that the prescribed distance should embrace the nearest point of the curve on the west, a bridge or ferry there, by the plaintiffs' construction, would be prohibited. What, in that event, would not be the inconvenience to the people of Tennessee living in the region of this western point, and within and outside of the great bend of the stream? In that case, what rule of measurement would apply? What would be considered the intention of the Legislature of that State? The public would be largely interested in the charter to the citizen, and the necessity of a construction favorable to the public, where the terms of the contract are doubtful, would be apparent. The case in this record is the case supposed upon a diminutive scale.

Let the judgment be affirmed.